

1

2

3

4

5

6

7

8

9

10                          UNITED STATES DISTRICT COURT

11                         CENTRAL DISTRICT OF CALIFORNIA

12

13    SHERMAN MANNING, an individual,    )  Case No.  17-07832-DDP-GJSx
                                         )
14                          Plaintiff,   )  **ORDER GRANTING PLAINTIFF'S**
                                         )  **MOTION FOR A PRELIMINARY**
15           v.                          )  **INJUNCTION**
                                         )
16                                       )
                                         )  [Dkt. 8]
17    JERRY POWERS, in his official capacity;  )
      KAREN THACKER, in her official     )
18    capacity; DOUGLAS BROOME, in his   )
      official capacity; SEAN WILSON, in his  )
19    official capacity; and DOES 1 through 10,  )
                                         )
20                                       )
21                          Defendants.  )
                                         )
22                                       )
                                         )
23    _____)

24

25          This matter comes before the court on Plaintiff's application for a preliminary

26    injunction.  Having considered the parties' submissions and heard oral argument, the

27    court adopts the following Order.

28

## I. BACKGROUND

Plaintiff Sherman Manning brings the present motion for a preliminary injunction against Defendants for various violations of his First Amendment rights related to the enforcement of his parole conditions.

Manning is an ordained Baptist minister, who is currently on parole under the supervision of the California Department of Corrections and Rehabilitation. (Decl. Manning ¶¶ 1, 2.) Collectively, Defendants are various officials of the Division of Adult Parole Operations ("DAPO"), a division of the California Department of Corrections of Rehabilitation. (Compl. ¶¶ 13-16.) Defendant Jerry Powers is the Director of DAPO. (*Id.*) Defendant Karen Thacker is a regional director for the Southern Region of DAPO, and Defendant Douglas Broome is a parole supervisor in the Southern Region of DAPO. (*Id.*) Defendant Sean Wilson is Manning's current parole agent. (Manning Decl. ¶41.)

In 1990, Manning entered a guilty plea to charges of aggravated sodomy and aggravated assault on a 17-year-old man. (*Id.* ¶ 13.) That same year, Manning was convicted of misdemeanor sexual battery involving a male between 16 and 18 years old. (*Id.* ¶ 14.) In 1995, a Georgia court convicted Manning of forcible sodomy and forcible oral copulation and sentenced him to sixteen years in prison. (*Id.* ¶¶ 8–9.)

Decades later, in February 2016, Manning was released from state prison in California. (*Id.* ¶10.) Upon release, Manning was given a set of almost one hundred parole conditions from DAPO. (*Id.* ¶ 10 & Ex. B.) Of these, Manning challenges Defendants' application of Special Conditions of Parole (SCP) 84 and 18.

### A. Special Parole Condition 84

Special Parole Condition 84 prohibits Manning from accessing social media. It states the following:

> You shall not use or access social media sites, social networking sites, peer-to-peer networks, or computer or cellular instant message systems; e.g. Facebook, Instagram, Twitter, Snapchat, Lync, Gmail, Yahoo, KIK messenger, Tumblr, etc. This would include any site which allows the user to have the ability to navigate the internet undetected. (*Id.*, Ex. C at 4.)

2

According to Manning, social media is an essential element of strengthening his religious beliefs and spreading his message. Posting videos of his sermons on social media sites enables him to deliver his message to people who are unable to attend his sermons and make connections with other people in the ministry. (*Id.* ¶ 7.) Moreover, posting his sermons on social media allows other pastors to see his sermons, which makes it easier for pastors that do not know Manning to reach out and ask him to be a guest preacher. (*Id.* ¶ 6.)

### B.  Special Parole Condition 18

Special Parole Condition 18 states: "You shall not enter or loiter within 250 feet of the perimeter of places where children congregate, (e.g. day care centers, school, parks, playgrounds, video arcades, swimming pools, state fairgrounds, county fairgrounds, etc.)." (*Id.*, Ex. B at 1 & Ex. C at 1.)  Manning contends that Defendants have interpreted this condition to prohibit him from attending church and preaching.

Around April 2017, Manning was assigned to parole agent Lorrie Schindler. (*Id.* ¶ 24.) Manning claims that during a parole meeting, Schindler told him she wanted a letter from each pastor of every church he was attending, acknowledging they knew he had been in prison and why he had been in prison. (*Id.* ¶ 25.) Manning refused. (*Id.*) In response, Schindler told Manning that "[he] should not be going to church anyway" and that she could arrest him for going to church pursuant to SCP 18. (*Id.* ¶¶ 25–26.)

After this conversation, Manning met with other parole agents to ascertain whether SCP 18 barred him from attending church. Manning met with Mr. Arcee, who he believed was Schindler's direct supervisor, and with Defendant Broome, Arcee's supervisor. (*Id.* ¶¶ 27–28.) During one of their meetings, Broome told Manning he agreed with Schindler that he could not attend church. (*Id.* ¶ 31.) Subsequently, Manning called Defendant Thacker, a regional director of DAPO. (*Id.* ¶ 32.) After his call with Thacker, Broome restated that Manning was barred from going to church and told him they would arrest him if he attended. (*Id.* ¶ 33.)

### C.  ACLU Involvement and Retaliation

3

In the wake of these events, Manning contacted the American Civil Liberties Union ("ACLU") for legal representation. (*Id.* ¶ 34.) On June 2, 2017, ACLU lawyers sent a pre-litigation demand letter to DAPO. (*Id.*) Manning alleges that, since the letter's issuance, he has been threatened and harassed by parole officials. (*Id.* ¶ 35.)

First, Manning claims that, a few days after the demand letter was sent, Schindler and Defendant Broome went to his house at five o'clock in the morning to perform a compliance check. (*Id.* ¶ 37.) When Manning asked them why they were doing a compliance check for the first time, Broome answered "you should have thought about that when you contacted the ACLU." (*Id.*) During the search, Schindler reviewed Manning's cellphone and found pornographic images, a violation of his parole conditions, and confiscated the cellphone for further review. (Schindler Decl. ¶ 5.)

Second, Manning claims that, a few days after this incident, Schindler and Broome performed a second compliance check in a parking lot where Manning was parked. (Manning Decl. ¶ 38). After Manning informed them that this conduct constituted harassment, Broome answered "contact the ACLU, maybe they can help you," and that Manning "should have thought about it before [he] got the ACLU on [their] ass." (*Id.*) Schindler claims this incident was a follow-up to the parole violations observed during the first compliance check. (Schindler Decl. ¶ 8.)

Several days after the second compliance check, Manning received a call from Broome. (*Id.* ¶ 39; Decl. Gandarilla ¶ 4.) During the call, Broome told Manning "you should leave the ACLU alone and your problems will stop. But if you keep communicating with them, it will be your worst nightmare." (Decl. Manning ¶ 39.)  The following day, Manning was arrested for four different parole violations. (*Id.* ¶ 40.) All the charges stemmed from evidence uncovered during the compliance checks. (*Id.*)

In addition to the compliance checks, Manning reports several incidents of retaliation by his current parole agent Defendant Wilson. Wilson replaced Schindler as Manning's parole agent. (*Id.* ¶ 41.) According to Defendants, Schindler and her

supervisor, Defendant Broome, are no longer involved in Manning's parole. (Wilson Decl. ¶ 3.)

Manning claims Wilson has threatened, harassed, and retaliated against him for exercising his First Amendment rights. For example, Manning states that Wilson told him "Word to the wise, I would leave the ACLU alone." (*Id.*) When Manning asked why, Wilson allegedly responded "you are a smart man, you should know your last arrest was about the ACLU. I have many guys on Facebook and I do not lock them up." (*Id.*) Manning reports that Wilson has made him meet on a daily basis, even though the ordinary practice was for him to meet with his parole agent twice a month. (*Id.* ¶ 42.) When Manning asked why Wilson was making him go to his office so often, Wilson reportedly answered "This is not my doing, they want me to monitor you closely. If I were you, I'd leave the ACLU alone." (*Id.*) Manning also claims Wilson intentionally made him miss an appointment with the ACLU under the pretense that he was checking paperwork on him. (*Id.*) Additionally, Manning claims that Wilson's decision to begin enforcing a homelessness registration requirement, which resulted in Manning's arrest by LAPD, was motivated by retaliatory animus. (Manning Second Supp. Decl. ¶¶ 2-11.)

Wilson claims that Manning was not required to come into the office on a daily basis in September, and that "Manning has not been required to come into the office more than is required or expected through regular parole supervision and the conditions of parole." (Wilson Decl. ¶ 14). Wilson also denies making "any reference[s] regarding [Manning's] parole in relation[] to a lawsuit." (*Id.* ¶ 4.) With respect to Manning's LAPD arrest, Wilson states that, even though he requested that Manning register as homeless, it was the LAPD, and not him "who made the decision to have him arrested." (*Id.* ¶ 19.)

Manning filed the present lawsuit on October 25, 2017, and moved for a preliminary injunction on October 30. (Dkts. 1, 9.) On November 1, Manning reports that Defendant Broome threatened that it was "suicide" for him to file a lawsuit, and that "this is going to cost you." (Manning Supp. Decl. ¶3-4.) On November 28, Wilson reportedly told Manning that his parole experience was going to get more difficult

because Manning had included him as a defendant in his lawsuit, and because he had "bitten off more than he could chew by messing with parole." (Manning Third Supp. Decl. ¶ 8.)  Wilson denies making this statement. (Wilson Decl. ¶ 16.)

On the basis of the facts set forth above, Manning brings claims under Section 1983 for violations of his First Amendment rights. (*See* Compl. ¶¶ 65–76.) In his preliminary injunction motion, Manning asks this Court to enjoin Defendants from: (1) enforcing Special Condition of Parole 84, barring Manning's access to social media sites; (2) interpreting Special Condition of Parole 18 to bar Manning from attending and preaching in church; and (3) retaliating against Manning for exercising his First Amendment rights. (Dkt. 9.)

## II. LEGAL STANDARD

The Supreme Court set forth the standard for assessing a motion for preliminary injunction in *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 376 (2008).  "Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009). In the Ninth Circuit, the existence of "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (quotations omitted).

## III. DISCUSSION

### A.  Likelihood of Success on the Merits

Manning's challenges turn on three legal issues, all arising from the First Amendment. First, Manning contests the propriety of Defendants' application of two Special Parole Conditions (SCP 84 and SCP 18) that he contends curtail his First Amendment rights. Additionally, Manning claims that Defendants have retaliated

against him for filing the present action in violation of the Petition Clause of the First Amendment. The court addresses Manning's likelihood of success on each issue in turn.

### 1. Whether SCP 84 Violates Manning's First Amendment Right to Freedom of Speech

The court finds that this case is controlled by the Supreme Court's recent decision in *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). In that decision, the Court struck down a state law that prohibited registered sex offenders from using major social media sites, including Facebook, LinkedIn, and Twitter, because it infringed on their First Amendment rights to freedom of speech. *Id*. at 1737. In light of the primacy of social media in the modern age, the Court found that "[t]hese websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.*

Special Condition of Parole 84 states that Manning "shall not use or access social media sites, social networking sites, peer-to-peer networks, or computer or cellular instant message systems: *e.g.* Facebook, Instagram, Twitter, Snapchat, Lync, Gmail, Yahoo, KIK Messenger, Tumblr, etc." (Manning Decl., Ex. C at 4.) Like the statute struck down in *Packingham*, this parole condition enacts a blanket prohibition against the use of social media and social networking sites.[1]

In *Packingham*, the Court concluded that a countervailing public interest in protecting victims and potential victims of sexual assault did not justify the broad scope of the statute's curtailment of free speech. *See id.* at 1737. Applying an intermediate level of scrutiny, the Court found the state statute was "unprecedented in the scope of First

---

[1] In fact, the prohibition in this case goes farther than in *Packingham*, as the state statute expressly exempted websites that "[p]rovid[e] only one of the following discrete services: photo-sharing, electronic mail, instant messenger, or chat room or message board platform," or that "have as their "primary purpose the facilitation of commercial transactions involving goods or services between [their] members or visitors." 137 S.Ct. 1733.

1
2

Amendment speech it burdens," and therefore not narrowly tailored "to further the government's legitimate interests."[2]

3
4
5
6
7
8
9
10

In the present case, the court recognizes that the state has similar interests in enforcing parole conditions that promote the goals of deterrence and public safety. However, these interests do not justify the sweeping prohibitions detailed in Special Parole Condition 84. In this particular case, none of Manning's prior convictions, each of which occurred at least 20 years ago, involved the use of the internet or social media. *See United States v. T.M.*, 330 F.3d 1235, 1240 (9th Cir. 2003) ("Supervised release conditions predicated upon twenty-year-old incidents, without more, do not promote the goals of public protection and deterrence.").

11
12
13

Because this condition is not narrowly tailored to serve a compelling government interest, the court concludes that Manning has shown a likelihood of success on the merits of his First Amendment claim with respect to Special Parole Condition 84.

14
15

### 2.   Whether SCP 18 Violates the Free Exercise Clause and Establishment Clauses of the First Amendment

16
17
18
19
20
21
22
23

Just as the First Amendment secures Manning's freedom of speech, it also safeguards his ability to engage in religious activity. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). The Free Exercise Clause of the First Amendment "protect[s] religious observers against unequal treatment and subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017). As relevant here, "the free exercise of religion unquestionably encompasses the

24
25
26
27
28

[2] Although not directly invoking the First Amendment, several courts have invalidated conditions of supervised release that similarly restrict an individual's ability to access computers or the internet. *See United States v. T.M.*, 330 F.3d 1235, 1239 (9th Cir. 2003) (invalidating condition that prohibited a former sex offender from accessing computer without prior approval); *United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) (invalidating condition that prohibited defendant convicted of securities fraud from using the internet without prior approval).

right to preach, proselyte, and perform other similar religious functions, or, in other words, to be a minister." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978).

Manning is an ordained Baptist preacher. (Manning Decl. ¶ 2.) He claims that Defendants' interpretation of Special Parole Condition 18 violates the Free Exercise Clause. Special Parole Condition 18 prevents Manning from "enter[ing] or loiter[ing] within 250 feet of the perimeter of places where children congregate, (e.g. day care centers, schools, parks, playgrounds, video arcades, swimming pools, state fairgrounds, county fairgrounds, etc.)." Manning asserts that, since late April 2017, Defendants have interpreted this provision to include churches. These churches, Manning contends, are where he carries out his chosen profession of serving as a preacher.

Absent additional information, it is not clear that the churches in which Manning preaches and worships are "places where children congregate," as contemplated by Special Parole Condition 18. Instead, Manning contends that Defendants have adopted a sweeping interpretation of Special Parole Condition 18 that prohibits Manning's church attendance because it is merely a place where children are or might be present.

Defendants do not appear to contest the legal standard, but claim that Manning "has not stated facts sufficient to establish that he is being prohibited from attending church." (Opp. at 4.) The court disagrees. Although Defendant Wilson maintains that he has attempted to accommodate Manning's church schedule and Defendants have not yet charged Manning with a parole violation for attending church, Manning has supplied ample evidence that Defendants might do so. According to Manning, on at least three separate occasions after late April 2017, Defendants expressly informed him that he was prohibited from going to church:

- Manning reports that Broome called him into his office and stated "he agreed with Ms. Schindler that I cannot go to church." (Manning Decl. ¶ 31.)
- Manning met with Defendant Broome and Thompson who "confirmed that [Manning] was barred from going to church by Condition 018." (¶ 33.)

- Defendant Broome and Thompson "reiterated that [Manning] was forbidden to go to church, and they will arrest [him] for doing so, or find some other reason to arrest [him], if [he does] go to church." (¶ 33.)
- During a period when Defendant Wilson was unavailable, Manning met with parole agent Mr. Rosales and his supervisor Ms. Han. (¶ 43.) Ms. Han informed Manning that "she was not going to overrule Mr. Thompson and that the rule was that I could not go to church." (¶ 44.)

Defendants do not controvert the existence of these statements prohibiting Manning from attending church, or concede that SCP 18 does not bar Manning from visiting churches or houses of worship. (*See* Eliasberg Decl. ¶ 4, Dkt. 41-1.) On this basis, Manning has raised serious concerns that Defendants' interpretation of Special Parole Condition 18 may extend to Manning's church attendance.

"[N]eutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause." *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015). Here, in contrast, it appears that Defendants have interpreted SCP 18 in such a way as to uniquely burden Manning's religious activities. Defendants have not, for example, construed SCP 18, which by its terms extends to "places where children congregate," to encompass grocery stores, shopping malls, movie theaters, or other public spaces where children and families may be present.

To withstand constitutional scrutiny, a prohibition that is not neutral or generally applicable must advance "only those interests of the highest order," and be narrowly tailored to serve those state interests. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). That criteria is not met here. Although public safety is a compelling state interest, the court finds that a blanket restriction on Manning's churchgoing is not narrowly tailored to suit this interest. None of Manning's convictions have any connection to churches or religious activity. (Manning Decl. ¶¶ 8-14.) Additionally, the alleged prohibition is overbroad in that it may reach even church events at which no children, or very few children, are ever present. Therefore, the court

concludes that an interpretation of SCP 18 that imposes a blanket prohibition on churchgoing is likely to result in a violation of the Free Exercise Clause.[3]

### 3. Whether Defendants Have Retaliated Against Manning in Violation of the First Amendment

Manning contends that Defendants have retaliated against him for filing the present lawsuit, in violation of his First Amendment rights under the Petition Clause. This clause safeguards "the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. It is not disputed that this lawsuit, and the pre-litigation demand letter, constitute protected conduct under the First Amendment. *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 382 (2011); *see Sosa v. DirecTV, Inc.*, 437 F.3d 923, 936 (9th Cir. 2006).

To prevail under Section 1983 for his retaliation claim, Manning must demonstrate that "there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). Stated differently, the plaintiff must show "the protected conduct was a substantial or motivating factor in the defendant's decision." *CarePartners, LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008). Once the plaintiff has made such a showing, then the defendant has the burden of showing "by a preponderance of the evidence that it *would* have reached the same decision [absent the protected conduct]; it is insufficient to show merely that it *could* have reached the same decision." *Id*.

With the exception of recent events involving Defendant Wilson, Defendants have submitted little to no evidence contesting Manning's reports of their statements of retaliatory animus, or indicating that they would have taken the same adverse actions

---

[3] In light of this holding, the court need not reach Manning's additional claim that Defendants' restrictions on his church activities violate the Establishment Clause.

11

absent Manning's pre-litigation letter and lawsuit.[4] Specifically, Defendants leave the following facts unchallenged:

- In the sixteen months after Manning was released on parole but before Defendants were sent a pre-litigation demand letter, Manning was not subject to a single compliance check. (¶ 36). Days after the issuance of the pre-litigation demand letter, Defendants conducted a pre-dawn compliance check of Manning's home. (¶ 37.)
- During this compliance check, when Manning questioned why the parole agents were conducting an inspection, Broome stated that Manning "should have thought about that when [he] contacted the ACLU." (¶ 37.)
- During a second compliance check several days later, Broome reiterated that Manning "should have thought about it before [he] got the ACLU on our ass." (¶ 38.)
- Several days after the second compliance check, Broome called Manning and said that "if you keep communicating with [the ACLU], it will be your worst nightmare." (¶ 39.) The day after this conversation, Manning was arrested for parole offenses arising from the previous compliance checks. (*Id*. ¶ 40.)

Beyond the compliance checks, Manning describes recent behavior evincing retaliatory animus by his current parole officer, Defendant Wilson. Manning reports that Wilson advised him to "leave the ACLU alone" because his "last arrest was about you and the ACLU. I have many guys on Facebook, and I do not lock them up." (*Id*. ¶ 41.) Manning claims that Wilson began a practice of scheduling meetings with Manning on a daily basis, despite the fact that Manning had previously met with his parole officer about twice a month. (*Id*. ¶ 42.) When asked about this change, Wilson reportedly explained that "they want me to monitor you closely" and reiterated that "I'd leave the ACLU alone." (*Id*.) On one occasion, Manning missed a meeting with an ACLU lawyer. (*Id*.) Manning claims that Wilson held him for six hours under the pretense of checking

---

[4] As evidence, Defendants submit two declarations from Manning's former parole officer Schindler and his current parole officer Defendant Wilson. (Dkt. 43-4; 39-1.) Absent are any declarations by Defendant Broome and Thompson, as well as other parole officers. Nor do Schindler or Wilson's declarations controvert the existence of the retaliatory statements made by Defendant Broome.

paperwork after he informed Wilson that he was going to a meeting with the ACLU that day. (*Id*.) Manning also claims that Wilson's decision to begin enforcing a homelessness registration requirement, which resulted in his arrest by LAPD, was motivated by retaliatory animus. (Manning Second Supp. Decl. ¶¶ 2-11.)

Although Wilson contests some of Manning's representations, it is unclear to what extent he leaves other parts unchallenged.  For example, Wilson generally denies having "made any referenced [sic] regarding [Manning's] parole conditions in relation[] to a lawsuit." (Wilson Decl. ¶ 17.) Wilson also states that, even though he requested that Manning register as homeless, it was the LAPD, and not him "who made the decision to have him arrested." (*Id*. ¶ 19.) Moreover, he claims that Schindler and Defendant Broome no longer have "any involvement in Mr. Manning's parole other than what is needed to respond to this case." (*Id.* ¶ 3.)

Still, it is not clear whether Wilson's general denial of making "reference[s] regarding his parole conditions in relation[] to a lawsuit" encompasses pre-litigation conduct arising after the ACLU's involvement. (Wilson Decl. ¶ 17.) This pre-litigation conduct includes statements by Wilson that "[Manning's] last arrest was about you and the ACLU"; that Wilson had "looked at [his] tracks" and discovered Manning went to the ACLU office while Wilson was away; and that if Manning continued meeting with the ACLU, Wilson would "make [his] life a living hell." (Manning Decl. ¶¶ 41, 43.) Nor does Wilson address Manning's claim that Wilson prevented him from attending a meeting with ACLU lawyers under the pretense of a six-hour parole meeting to check paperwork. (*Id.* ¶ 42.) Furthermore, it is unclear whether Wilson agrees that Manning is now required to come into the office more often than he did before the onset of the litigation.

Therefore, on the basis of the evidence set forth, the court concludes that Manning has established a likelihood of prevailing on his retaliation claim against Defendants.

**B.  Irreparable Harm**

Both the Ninth Circuit and the Supreme Court have recognized that the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Defendants, relying upon a Seventh Circuit case, question whether *Elrod*'s holding applies as strongly outside of the context of political speech, where "timing is of the essence." (Opp. at 10 (citing *Am. Civil Liberties Union of Illinois v. City of St. Charles*, 794 F.2d 265 (7th Cir. 1986).) Yet there is no indication that this principle is not equally applicable to the content of Manning's sermons, or that *Elrod* is no longer good law. Moreover, "retaliatory action for protected activity carries with it the risk that [others] may be deterred from engaging in legitimate conduct." *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938–39 (9th Cir. 1987). This retaliatory action "cause[s] irreparable harm to the public interest in enforcing the law by deterring others from filing charges." *Garcia v. Lawn*, 805 F.2d 1400, 1405–06 (9th Cir. 1986). Accordingly, the court finds that irreparable injury is likely to occur absent preliminary injunctive relief.

### C. Balance of the Equities

In weighing the equities of a preliminary injunction, a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

The court concludes that the equities tip sharply in Manning's favor. Notably, even if Defendants were unable to enforce Special Parole Condition 84, or prohibit Manning from attending church pursuant to Special Parole Condition 18, they could serve the interests of deterrence and public safety through other parole conditions. These parole conditions, which Manning does not challenge in the present action, include but are not limited to:

- Special Condition 14: "You shall not have contact with any minor male you know or reasonably should know is under the age of 18." (Manning Decl., Ex. C.)
- Special Condition 85: "You shall not use the computer for any purpose which might further sexual activity; e.g., possession of sexually explicit material in any form. . . ." (*Id.*)
- Special Condition 86: "You shall not use the computer for any purpose which might further sexual activity involving minor children. . . ." (*Id.*)

- Special Condition 105: "You shall not create an account with or log into: Facebook, Plenty of Fish, Match.com, Christian Mingle, etc. or any other social media websites that prohibit use by registered Sex Offenders." (*Id*.)

As part of the conditions of his parole, Manning also wears a GPS-enabled ankle monitor that enables Defendants to track his location. (*Id*. at 3.) Moreover, the court's ruling would not invalidate Special Condition of Parole 18, which bars Manning from going near "places where children congregate," but invalidate an interpretation of this parole condition that bars Manning from attending church as a blanket prohibition.

Thus, the court concludes that Defendants' interests would not be unduly obstructed if the challenged parole conditions were enforced in a manner that comports with Manning's First Amendment rights.

### D. Public Interest

In analyzing whether the public interest would be served by a preliminary injunction, a court primarily looks to the impact of the judgment on third parties. *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002). Here, the court concludes that there is a "significant public interest" in enforcing Manning's First Amendment rights, particularly as the application of the parole conditions would potentially infringe on the rights of congregants and others to hear Manning's sermons. Therefore, this factor also tilts in favor of granting the injunction.

### E. Appropriateness of Preliminary Injunctive Relief

Defendants argue that awarding Manning injunctive relief at this stage would be improper because he would "obtain the ultimate relief sought in litigation through the preliminary injunction." (Opp. at 1.) However, as Manning highlights, a preliminary injunction falls short of ultimate relief as it would "only allow Mr. Manning to attend church and use social media *during the pendency of this litigation*." (Reply at 22.)

Additionally, Defendants argue that preliminary relief is improper because it will change, not preserve, the status quo. (Opp. at 2.) In other words, the relief sought is "mandatory" rather than "prohibitory" in nature. *Hernandez v. Sessions*, 872 F.3d 976, 999

(9th Cir. 2017). Mandatory injunctions that alter the status quo must meet a higher standard than prohibitory injunctions, and are justified when "extreme or very serious damage will result." *Id.* The court concludes that the present injunction is prohibitory, as it "prevents future constitutional violations, a classic form of prohibitory injunction." *Id.* at 998.

Finally, Defendants challenge the issuance of a preliminary injunction instructing them to refrain from retaliatory action against Manning. Defendants claim that this would merely prohibit them "from engaging in behavior that they are already prohibited from engaging in based on existing law." (Opp. at 12.) They also claim that granting such relief "would necessitate a finding by this Court that the Defendants have been acting out in retaliation." (*Id.*) The court observes that substantial parts of Manning's evidence concerning retaliatory animus by Defendants, and all of Manning's evidence concerning retaliatory statements by Defendant Broome, go unchallenged. *See supra* Parts III.A.2, III.A.3. Moreover, in other cases, courts have granted preliminary injunctions enjoining the parties from retaliatory conduct, particularly when the retaliatory conduct constituted an irreparable harm by chilling the protected activity of others. *See, e.g.*, *Reyes v. Transamerica Life Ins. Co.*, No. CV153452DMGFFMX, 2015 WL 13376523, at *7 (C.D. Cal. Dec. 23, 2015) (enjoining retaliatory behavior for "actions that relate to or arise out of contested claims asserted in this lawsuit").

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's application for a preliminary injunction.[5] In view of the evidence set forth by the parties, the court concludes that Plaintiff has established "(1) [he is] likely to succeed on the merits; (2) [he is] likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of

---

[5] As Plaintiff has satisfied the criteria for a preliminary injunction, and Defendants have proffered little indication that they will adduce arguments or specific evidence to rebut the court's initial conclusions at the motion to dismiss phase, the court declines to delay a ruling on Plaintiff's preliminary injunction until the court has heard Defendants' motion to dismiss. (*See* Opp. at 4.)

equities tips in [his] favor; and (4) a preliminary injunction is in the public interest."
*Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).

Defendants and their agents or representatives are hereby retrained and enjoined pending trial of this action from the following actions:

(1) enforcing Manning's Special Condition of Parole 84, except insofar as it prohibits him from using "any site which allows the user to have the ability to navigate the internet undetected";

(2) interpreting Manning's Special Condition of Parole 18 to bar Manning from attending church and preaching in church;

(3) taking any retaliatory or discriminatory measures or other adverse actions with the purpose of precluding, deterring, or discouraging Manning from exercising his rights under the Petition Clause of the First Amendment by participating in the present action.

Nothing in the foregoing restrictions shall prevent the Department of Adult Parole Operations from fulfilling its important supervisorial and public safety functions. Furthermore, the court recognizes that circumstances may change in the future that result in the modification of the current conditions of parole.

**IT IS SO ORDERED.**

Dated: December 13, 2017

_____

DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE