1
2
3
4
5

Peter J. Eliasberg (SBN 189110)
Email: peliasberg@aclusocal.org
Lydia Gray (SBN 310338)
Email: lgray@aclusocal.org
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

6
7

*Counsel for Plaintiff*
(Additional counsel for plaintiff on following page)

8

9
10

**UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA**

11
12

13

SHERMAN MANNING, an individual,

CASE NO. 2:17-CV-7832 DDP (GJSx)

14

*Plaintiff*,

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

15

16

v.

17
18
19
20
21

JEFFREY GREEN, in his official
capacity; KAREN THACKER, in her
official capacity; DOUGLAS
BROOME, in his official capacity;
SEAN WILSON, in his official
capacity; and DOES 1 through 10,

22

*Defendants*.

23
24
25
26
27
28

1

2

3

4

Jennifer Stisa Granick (SBN 168423)
American Civil Liberties Union
Speech, Privacy, and Technology Project
39 Drumm St.
San Francisco, CA  94111-4805
Telephone: (415) 343-0758
Email: jgranick@aclu.org

5

6

7

Erin Darling (SBN No. 259724)
Law Offices of Erin Darling
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
Telephone: (323) 736-2230
Email: erin@erindarlinglaw.com

8

9

10

11

Daniel Mach (*pro hac vice application forthcoming*)
American Civil Liberties Union Foundation
Program on Freedom of Religion and Belief
915 15th St., NW
Washington, DC  20005
Telephone: (202) 548-6604
Email: dmach@aclu.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 (in that they arise under the Constitution of the United States), § 1343(a)(3) (in that they are brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the United States Constitution), § 1343(a)(4) (in that they seek to secure equitable relief under 42 U.S.C. § 1983), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

2.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims herein occurred in this District.

3.     This Court has the authority to grant damages, declaratory and injunctive relief, and any other appropriate relief pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## INTRODUCTION

4.     Parole officials do not have untrammeled authority to burden the First Amendment rights of people on parole to express themselves and exercise their religion just because they remain under the supervision of the criminal justice system.

5.     Parole officials may not impose blanket restrictions on use of social media sites and other Internet sites, which the Supreme Court has recently described as "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and whose use the Court has held is protected by the First Amendment right to freedom of expression.  But Defendants and their agents are doing exactly that – Mr. Manning is prohibited from using and accessing all social media sites, social network sites, peer-to-peer networks, and computer or cellular instant messaging systems.

6.     This Internet restriction bears no relation to the crime for which Mr.

1   Manning is on parole, nor to any previous crime for which he has been convicted.

2   In other words, no criminal act in Mr. Manning's past was committed on the

3   Internet or through use of social media; he did not meet any of the victims of his

4   crimes through social media, nor is there even the faintest connection between

5   social media and any of his past criminal acts.  Accordingly, Defendants' attempt

6   to bar him completely from using or accessing social media for any purpose

7   involves a greater deprivation of his fundamental liberty interest than is reasonably

8   necessary to effectuate the purposes of supervised release.

9          7.     Nor may parole officials completely bar the doors to houses of

10  worship to people on parole.  Yet Defendants are doing precisely that.  They or

11  their agents have repeatedly told Mr. Manning that one of his conditions of parole

12  bars him from attending church as a member of the congregation and from

13  preaching in church, and they have threatened to have him arrested if he does, even

14  though these practices are protected under the Free Exercise and Establishment

15  Clauses of the First Amendment.  Moreover, Mr. Manning is an ordained Baptist

16  minister who has been invited to preach by pastors at numerous Baptist churches in

17  the Los Angeles area, all of whom are aware that he is on parole and released from

18  prison less than two years ago.

19         8.     This churchgoing restriction bears no relation to the crime for which

20  Mr. Manning is on parole, nor to any previous crime for which he has been

21  convicted.  In other words, no criminal act in Mr. Manning's past was committed

22  in church, he did not meet any of the victims of his crimes in church, nor is there

23  even the faintest connection between church and any of his past criminal acts.

24  Accordingly, Defendants' attempt to bar him from attending church involves a

25  greater deprivation of his fundamental liberty interest than is reasonably necessary

26  to effectuate the purposes of supervised release.

27         9.     The crime for which Mr. Manning is on parole is forcible sodomy and

28  forcible oral copulation with an adult male in 1995.  He was also convicted of two

prior sex offenses.  The first, aggravated sodomy and sexual assault on a 17 year old male, occurred in 1990 in Georgia when Mr. Manning was 24 years old.  A 17 year old is not a minor under Georgia law.  *See* Ga. Code §§ 16-6-2 and 16-6-4. The second was a conviction for misdemeanor sexual battery in Virginia in 1992. Similarly, this was not charged as a sexual offense with a minor, because age is not an element of misdemeanor sexual battery under Virginia law.  *See* Va. Code § 18.2-67.4.  To the best of Mr. Manning's recollection, this offense involved a male between 16 and 18 years old.  Therefore, Mr. Manning has never been charged with, and has not ever pleaded guilty to, any sexual crime with a minor.

10.     While Mr. Manning was in prison in California, he was also convicted of making threats against a peace officer, which extended his sentence.  The threat was communicated by mail in a letter to which he signed his own name and hand delivered to a prison guard for posting.  He did not communicate the threat on the Internet, or research the person against whom the threat was made on the Internet, nor did the Internet have any other connection or relation to the crime.   Nor did the threat have any connection to a church.

11.     Finally, the First Amendment prohibits government officials from retaliating against individuals for exercising their First Amendment right to petition government for redress of grievances.  Yet Defendants Broome, Wilson, and possibly others, are doing exactly that.  Mr. Manning sought the assistance of the ACLU, which wrote a letter on his behalf to Defendants and their agents, explaining why two of his parole conditions violated his First Amendment rights. In response, Defendants retaliated against him, subjecting him to searches he had never once experienced in about 16 months on parole before the ACLU wrote parole on his behalf.  Worse still, his parole agents repeatedly warned him against further associating with his legal counsel, the ACLU, and informed him that the problems he was experiencing with parole would not have happened if he hadn't "got[ten] the ACLU on [their] ass."

# PARTIES

12.     Plaintiff is an ordained Baptist minister who lives in Los Angeles. He is on parole, under the supervision of the Adult Parole Division of the California Department of Corrections and Rehabilitation.

13.     Defendant Jeffrey Green is the Deputy Director of the California Division of Adult Parole Operations (DAPO), a division of California's Department of Corrections and Rehabilitation.  DAPO is divided geographically into two regions, Northern and Southern, and employs all parole agents who supervise adults on parole.  He is sued in his official capacity.

14.     Defendant Karen Thacker is a Regional Parole Administrator for the Southern Region of DAPO and is responsible for the day to day operations of supervision of all adults on parole in the Southern California area, including Los Angeles.  She is sued in her official capacity.

15.     Defendant Douglas Broome is a parole supervisor who works in the Southern Region of DAPO.  He is sued in his official capacity.

16.     Defendant Sean Wilson is a parole agent who works in the Southern Region of DAPO.  He is sued in his official capacity.

17.     The true names and capacities of Defendants Does 1 through 10 are unknown to Plaintiff who therefore sues these Defendants by fictitious names. Doe Defendants include any DAPO employees who ordered or otherwise participated in the retaliation of Plaintiff for exercising his First Amendment rights.

18.     All of the Defendants' actions were taken under color of state law.

## FACTUAL ALLEGATIONS

### Mr. Manning's Religious Beliefs and Practice

19.     Mr. Manning has long-standing religious beliefs that date to his youth. He became an ordained minister at the age of 18 in Atlanta, Georgia at the First Corinth Baptist Church in 1984, after completing a five-year mentorship program.

20.     He views preaching as his life's calling and would like to deliver

1    sermons, or at least be in church, five times per week.

2         21.    After his release from prison and before one of his parole agents

3    barred him from attending church, he was devoting about 30 hours per week to his

4    religious activities, with approximately 10-12 of those hours being spent in church.

5         22.    Preaching is not only a calling for Mr. Manning, it is also a profession

6    that enables him to support himself and remain off government assistance, such as

7    welfare and food stamps.  He receives donations when he preaches sermons as a

8    "guest preacher" by invitation.

9         23.    Attending church is also critical to Mr. Manning's preaching activity

10   because it gives him the opportunity to meet pastors and develop relationships that

11   frequently lead to his being invited to deliver guest sermons at their churches.

12        24.    Mr. Manning continues to pursue his calling to be a better pastor.  He

13   recently attended the Word Handlers Workshop at the invitation of its organizer,

14   Dr. R. A. Williams.  Dr. Williams is the pastor at the McCoy Memorial Baptist

15   Church in Los Angeles.  Dr. Williams invited Mr. Manning to attend and gave him

16   a scholarship to cover the ordinary $350 cost of the conference.  The workshop is

17   designed to help pastors become better and more effective preachers and directors

18   of their churches.  Mr. Manning attended a variety of sessions, including some

19   devoted to learning Hebrew and Greek because those are the original languages in

20   which the Bible was written.

21   **The Role of Social Media in Supporting Mr. Manning's Efforts to Preach and**

22              **Strengthen His Connections to His Faith Community**

23        25.    Social media would be an essential tool for Mr. Manning to spread his

24   message and religious beliefs more widely in at least three ways.  First, posting

25   videos of his sermons on sites such as YouTube and Facebook – two of the world's

26   largest and most used social media sites – would enable him to deliver his message

27   to people who do not live in the Los Angeles area or are otherwise unable to attend

28   churches when and where he is delivering sermons.  Second, having his sermons

on YouTube and Facebook would allow people whom he does not know, but who may be interested in his message, to contact him, and to communicate with him and learn about his future guest sermons.  This would also allow other pastors to learn about him and evaluate the quality of his preaching, which increases the number of invitations he may receive to deliver guest sermons.  Third, there is a fellowship among ministers, and social media sites are a means of strengthening that fellowship.  Given the incredible number of people who use social media, including pastors, Defendants' barring Mr. Manning from social media prevents him from connecting with religious figures from his past in Atlanta as well as preventing them from re-connecting with him.

### The Conviction for Which Mr. Manning Is on Parole and the Challenged Parole Conditions

26.     Mr. Manning is on parole for a 1995 conviction for forcible sodomy and forcible oral copulation with Ricardo Calvario, a 20 or 21 year old man.  He had solicited Mr. Calvario on the street.  He had never met him before.  He did not communicate with Mr. Calvario on the Internet, research him on the Internet, nor did the Internet have any other connection or relation to the crime.  He also did not meet Mr. Calvario in church or on church property, have sex with him at church or church property, nor was there any other connection between the crime and church.

27.     Mr. Manning was sentenced to 16 years in prison.  While he was in prison, he was also convicted of making threats against a peace officer.  The threat was communicated by mail in a letter to which he signed his own name and hand delivered to a prison guard for posting.  He did not communicate the threat on the Internet, or research the person against whom the threat was made on the Internet, nor did the Internet have any other connection or relation to the crime.   Nor did the threat have any connection to a church.

28.     He was released from California prison in February 2016.  Shortly after his release, his first parole agent Mr. Turner, presented Mr. Manning with a

set of conditions of parole from the Adult Parole Division; they were not conditions imposed by the court.  There were more than 100 conditions, most of which were similar to the current set of conditions he was given in April 2017 by a subsequent parole agent, Ms. Schindler, and that still apply to him.  Special Condition 018 in both the February 2016 and April 2017 conditions provided: "You shall not enter or loiter within 250 feet of the perimeter of places where children congregate, (e.g., day care centers, schools, parks, playgrounds, video arcades, swimming pools, state fairgrounds, county fairgrounds, etc.)."  Mr. Manning did not understand that condition to bar him from preaching at or attending church, nor did Mr. Turner or his next two parole agents suggest that the condition barred him from doing so.

29.     Condition 084 in the April 2017 set of conditions bars him from, among other things, using social media sites like YouTube, Facebook, and Twitter. That condition states: "You shall not use or access social media sites, social networking sites, peer-to-peer networks, or computer or cellular instant message systems: e.g. Facebook, Instagram, Twitter, Snapchat, Lync, Gmail, Yahoo, KIK Messenger, Tumblr, etc.  This would include any site which allows the user to have the ability to navigate the internet undetected."

**Mr. Manning's Church Attendance and Guest Ministry After His Release from Prison**

30.     After his release from prison, Mr. Manning attended a wide variety of Baptist and Evangelical churches regularly.  He attended at least five services a week.  He introduced himself to the pastors of the churches he attended, and some of them referred him to other churches and pastors.  He also attended the weekly Baptist Ministers' Conference in Los Angeles, where he frequently spoke with pastors about his interest in doing guest sermons.

31.     Mr. Manning received his first guest ministry job about a month after his release.  After a while, he was working as a guest minister about once a week,

usually on Sunday morning, Sunday evening, or Thursday evening services. He was invited to preach by, among others, Pastor Stan Richards of the Beacon Light Baptist Church, Pastor Michael Rowles of Wrecking Crew for Christ, Pastor Kenneth Pitchford of Greater Hopewell Full Gospel Baptist Church and Rehoboth Missionary Baptist Church, and Pastor Terry Wilson of Good News Missionary Baptist Church.

32.    All of these pastors were pleased with Mr. Manning's sermons and behavior in church. Pastor Richards, for example, described Mr. Manning as a "model congregant," and Pastor Rowles described Mr. Manning as "respectful and "welcome at [his church] anytime."

33.    When Mr. Manning went to church after his release from prison, he was frequently accompanied by a friend, Jorge Gandarilla, a former prison guard from the Arizona Department of Corrections. As he got to know the pastors at the churches he attended, he generally would be invited to sit in the pulpit area with them, not in the pews. It is not uncommon for there to be children with their families at church, but Mr. Manning made no effort to interact with them.

**Mr. Manning's First Few Parole Agents' Knowledge that He was Attending Church**

34.    Mr. Manning shared his love of preaching with his first parole agent, Mr. Turner, after his release from prison in February 2016. He also told Mr. Turner that he was earning money through guest preaching. Mr. Turner was very encouraging about both his going to church and preaching.

35.    In May 2016, a Court determined Mr. Manning had violated parole by logging onto Facebook and by not following his 10 pm curfew. He was sentenced to 120 days and served about 60 of them.

36.    Upon his release, he was assigned to a new parole agent, Mr. Sandoval. Mr. Manning assumed Mr. Sandoval knew he was attending church, given that Mr. Manning wore a GPS monitor. Mr. Sandoval never told Mr.

1    Manning that doing so was a problem.

2        37.    Mr. Manning was assigned to another parole agent, Tim Tottress, a

3    few months later.  Mr. Manning told Mr. Tottress about his church attendance and

4    his preaching.  Like Mr. Turner, he was very encouraging about the activities.

5    **Parole Interprets Special Condition 018 to Bar Mr. Manning from Attending**

6                                    **Church**

7        38.    Mr. Manning was arrested for a parole violation in December 2016 on

8    allegations that he had violated two of his conditions of parole by a) logging onto

9    Facebook and b) using the computer for a "purpose which might further sexual

10   activity."  Parole offiers did *not* arrest him for violating the condition barring him

11   from using "the computer for any purpose that might further sexual activity with

12   minor children."  The court found there was no probable cause to believe he had

13   used the computer for a "purpose which might further sexual activity" and

14   dismissed that charge.  The court did find he had logged into Facebook.  He was

15   sentenced to a term of 100 days for this Facebook violation.

16       39.    When Mr. Manning was released in late April 2017, he was assigned

17   to a new parole agent, Ms. Schindler, who provided him with a new set of parole

18   conditions.

19       40.    At their first meeting (or one of the first) at the parole office Ms.

20   Schindler told Mr. Manning, in sum and substance, that he "needed to get a real

21   job, because this preaching stuff is not going to work."  Mr. Manning was very

22   surprised and explained to her that preaching was not just his work, but his faith.

23   She responded that she wanted Mr. Manning to provide her with a letter from the

24   pastor of every church he was attending acknowledging that they knew not just that

25   he had been in prison, but why he had been in prison.  Although Mr. Manning had

26   told some of the pastors why he had been in prison, he did not think it was right

27   that he had to tell all of them and get letters from them to give to her, so he

28   responded that he could not do that.  Ms. Schindler then said, "You should not be

1  going to church anyway, I could arrest you for that."

2       41.    Mr. Manning was shocked by her statement and asked her on what

3  basis she could bar him from going to church, and she responded by identifying

4  Special Condition 018.

5       42.    Mr. Manning was upset with Ms. Schindler's claim that Special

6  Condition 018 forbade him from going to church.  So, he returned to the parole

7  office the next day to see Mr. Arcee, who he believed was Ms. Schindler's direct

8  supervisor.  Mr. Arcee told Manning that he was not going to require him to get

9  letters from all the pastors acknowledging why he had been in prison and said he

10 was skeptical that barring him from going to church was permissible and said he'd

11 discuss it with Ms. Schindler.  Mr. Manning asked Mr. Arcee to put in writing that

12 it was ok for him to go to church, but Mr. Arcee refused to do so.

13      43.    Concerned that he had no written assurance he could go to church,

14 Mr. Manning returned to the office two days later to see Mr. Arcee's supervisor,

15 Douglas Broome.  He, too, said he did not think it should be an issue for Mr.

16 Manning to attend church, but he also refused to put it in writing, as Manning

17 requested.

18      44.    About a week later, Mr. Manning went to see the District

19 Administrator, Vincent Thompson.  Thompson called Messrs. Arcee and Broome

20 into the office.  During the meeting, Thompson said he thought church attendance

21 was a "gray area," and ultimately it is up to Mr. Manning and his agent.  Mr.

22 Manning asked for a written commitment that he could go to church, and

23 Thompson refused, again saying it was up to Manning and his agent.

24      45.    Unable to obtain any assurance that he could exercise his faith by

25 preaching and attending church, Mr. Manning telephoned Chief Deputy of Parole,

26 Enrique Gonzalez at Parole Headquarters in Walnut Creek.  Mr. Gonzalez told Mr.

27 Manning he had never heard of such a parole condition and that he thought it was

28 great Mr. Manning was preaching.  He also said he would call Vincent Thompson

1  to discuss the issue.  When Mr. Gonzalez called Mr. Manning back, he told him

2  attending church was not a problem, but he, too, refused to put it in writing.

3      46.    A few hours later Mr. Manning got a telephone call from Douglas

4  Broome.  Mr. Broome sounded very angry and demanded that Mr. Manning come

5  into the parole office.  When Mr. Manning spoke with Mr. Broome in person, he

6  criticized Mr. Manning for calling Mr. Gonzalez and told him he agreed with Ms.

7  Schindler that Mr. Manning cannot go to church.

8      47.    Believing that this condition was illegal, Mr. Manning telephoned

9  Karen Thacker, Director of Adult Parole Supervision.  Upon information and

10  belief, Ms. Thacker has the authority to direct subordinates to alter their

11  interpretations of written conditions of parole.  When they spoke, she did not take a

12  position on whether this was a legitimate restriction but she told him she would

13  look into it.

14      48.    Mr. Manning did not hear back from Ms. Thacker.  Plaintiff alleges

15  on information and belief that Ms. Thacker took no action to ensure that her

16  subordinates made clear to Mr. Manning that he was free to attend church and

17  preach.

18      49.    Although Ms. Thacker did not respond to Mr. Manning's call,

19  Douglas Broome called him into the parole office where Mr. Manning met with

20  him and Vincent Thompson.  They confirmed that he was barred from going to

21  church by Special Condition 018 and they also changed his Sharper Future sex

22  therapy appointments to conflict with the weekly 11 am Monday Baptist Minister's

23  Conference that Mr. Manning regularly attended.  Mr. Broome also told him that

24  he was going to call Pastor Richards to tell him that he was on parole, and asked

25  him to leave the office.  When he returned to the office, they reiterated that Mr.

26  Manning was prohibited from going to church, and they would arrest him for doing

27  so, or find some other reason to arrest him if he went to church.

28

## The ACLU Writes a Letter on Mr. Manning's Behalf

50.     At this point, Mr. Manning was so upset about the Defendants' barring him from attending church that he reached out to the ACLU.  On June 2, 2017, the ACLU sent a letter on Mr. Manning's behalf – along with a copy of his ordination certificate and a letter from Pastor Stan Richards who had invited Mr. Manning to deliver a sermon at his church – to officials of the Adult Parole Division.  The letter stated that conditions 084 and 018 – as interpreted to bar him from attending church or preaching – violated Mr. Manning's First Amendment rights.

51.     The letter was addressed to Jeffrey Green, Karen Thacker, and others.  Upon information and belief, both Mr. Green and Ms. Thacker have the authority to direct subordinates to remove written parole conditions or to alter their interpretations of written parole conditions.  Despite being put on notice of these constitutional violations, however, Mr. Green and Ms. Thacker did not take any actions to address them.

52.     Similarly, the letter did not cause Mr. Manning's parole agent or supervisors to change their positions.  In fact, in the months since then, Ms. Schindler and others in parole have reiterated that he may not attend church and have made a number of threatening comments about his seeking the assistance of the ACLU.

## Harassment by Parole Agents Since the ACLU Wrote a Letter on Behalf of Mr. Manning

53.     Ever since the ACLU wrote a letter on Mr. Manning's behalf, he has received verbal abuse, threats, and retaliatory searches and administrative burdens from a number of people in Adult Parole.

54.     Upon information and belief, the retaliatory actions may have been ordered by unknown DAPO employees, including those who received and read the ACLU letter, which the ACLU did send to Defendants Broome, Wilson, or another

parole agent, Ms. Schindler, who have engaged in the retaliatory actions alleged herein.

55.    In the 16 months between Mr. Manning's release from prison and the ACLU's sending a letter on his behalf, Manning had consistently interacted with parole twice a month.  He had one in person meeting at the parole office and one meeting in the field.  On information and belief, parole claims the authority to do compliance checks, at which they locate a parolee in the field or where the parolee is living, not at the parolee's regularly scheduled twice a week meetings.  During those compliance checks, they may search the parolee, the place the parolee is staying, look at the parolee's phone, computer, etc.  But, Mr. Manning did not have a single compliance check between the time he was released from prison in February 2016 and June 2, 2017, when the ACLU transmitted its letter.

56.    Within a few days of the ACLU's transmitting its letter, Mr. Manning's then-parole agent, Ms. Schindler, a supervising agent, Mr. Broome, and some other people wearing jackets that said "Parole" on them, knocked on the door of the house where Mr. Manning was staying at 5 am in the morning.  They said they were there for a "compliance check."  When Mr. Manning asked them what it was all about and why they were searching his residence for the first time after he had been on parole for more than a year, Mr. Broome answered, "you should have thought about that when you contacted the ACLU."

57.    A few days later, Mr. Broome and Ms. Schindler pulled into a parking lot where Mr. Manning was and told him they were conducting another compliance check.  Mr. Manning complained and said, "you just did a compliance check a few days ago, this is harassment."  Mr. Broome said in a sarcastic tone, "contact the ACLU, maybe they can help you."  He also said to Mr. Manning that he "should have thought about it before you got the ACLU on our ass."

58.    A day or two later, Mr. Manning was driving in his car with his friend, Jorge Gandarilla, when he received a telephone call from Douglas Broome.

He put the call on speaker so Mr. Gandarilla could hear it.  During the call Mr. Broome said to Mr. Manning, "you should leave the ACLU alone and your problems will stop. But, if you keep communicating with them, it will be your worst nightmare."  He was arrested the next day for four different offenses: accessing Facebook, having an open container in his car, a curfew violation, and accessing pornography.  The Facebook, open container, and pornography charges all stemmed from the compliance checks Mr. Broome and Ms. Schindler did at the house where Mr. Manning was staying and of Mr. Manning's car when they confronted him in the parking lot.  Mr. Manning pled to three of the charges, but not the Facebook charge, and served about 75 days in jail.

59.    When Mr. Manning was released after serving time on his parole revocation, he was assigned a new parole agent, Mr. Wilson.  The two met a few times including on Friday, September 8, 2017.  During that meeting, Mr. Wilson said to Mr. Manning, "Word to the wise, I'd leave the ACLU alone."  Mr. Manning asked him "why?" and Wilson responded in so many words, "You are a smart man, you should know your last arrest was about you and the ACLU. I have many guys on Facebook, and I do not lock them up."

60.    Mr. Wilson also started to call Mr. Manning into his office daily, including two days in a row at one point, even though the ordinary practice is for a person on parole to meet with his agent twice a month.  When Mr. Manning asked him why he was calling him in like this, he said "this is not my doing, they want me to monitor you closely.  If I were you, I'd leave the ACLU alone."

61.    The next day, Mr. Wilson asked Mr. Manning what he was planning to do that day, and he told him he was going to contact the ACLU.  After Mr. Manning told him where he intended to go, Mr. Wilson ordered him stay in the office most of the day – about six hours. When Mr. Manning asked him why, Mr. Wilson simply said was "checking paper work" on him.  As a result, Mr. Manning ended up missing the appointment he had scheduled with a lawyer at the ACLU.

62.     Prior to his spending six hours at the parole office and the ACLU's sending a letter on Mr. Manning's behalf, his average meeting with his parole agents at the office or in the field lasted 10-20 minutes. He had never had a meeting last more than an hour.

63.     During a period of time that Mr. Wilson was unavailable, Mr. Manning met with a different parole agent, Mr. Rosales, and his supervisor, Ms. Han.  On October 23, 2017, Mr. Wilson came to where Mr. Manning was located and told him he was "back on the job" and that he "looked at [Mr. Manning's] tracks" and discovered he had gone to the ACLU office while Mr. Wilson was gone.  Mr. Wilson told Mr. Wilson he "controls [Mr. Manning's] life" and Mr. Manning is "subject to arrest at any day."  If Mr. Manning continued meeting with the ACLU, Mr. Wilson threatened to change his curfew to 8 or 9 in the evening and to "make [his] life a living hell."

**Mr. Manning's Most Recent Parole Agents Reiterate that He May not Go to Church**

64.     In late August 2017, Mr. Manning reported to Judy Han, a parole supervisor, because his line parole agent was not available. During their meeting Mr. Manning asked whether he could attend church and preach.  Ms. Han responded that she was not going to overrule Mr. Thompson, and that the rule was that he could not go to church. When Mr. Manning asked her why Mr. Turner, an agent Ms. Han supervised, had permitted and even encouraged Mr. Manning to go church, she refused to answer.

65.     In September 2017, Mr. Manning was assigned to a different parole agent, Mr. Rosales. They had their first meeting on Thursday September 21, 2017 at the Carl's Jr. at Martin Luther King Jr. Boulevard and Vermont Avenue. At that meeting, Mr. Rosales told Mr. Manning that he may not go to church or preach at church.  He did not equivocate in any way about the prohibition.

66.     On October 23, 2017, Mr. Wilson told Mr. Manning again that he

could not go to church and that if he did not go to church, he "would never go back to jail."

**Mr. Manning's Parole Agents Continue to Retaliate Against Him After He Filed this Lawsuit**

67.     After the original complaint in this lawsuit was filed, Mr. Manning's parole agents have continued to retaliate against him.  For example, as set forth in detail in the paragraphs below, just 48 hours after this Court entered a preliminary injunction enjoining Defendants from, among other things, "taking any retaliatory or discriminatory measures or other adverse actions with the purpose of precluding, deterring, or discouraging Manning from exercising his rights under the Petition Clause of the First Amendment by participating in the present action," Defendants attempted to transfer Mr. Manning more than 100 miles outside of Los Angeles, to Indio, California, giving him less than one business day to leave.  After Plaintiff's attorneys intervened and alleged retaliation, Defendants immediately revoked the transfer order.

68.     This Court held a hearing on Mr. Manning's Motion for Preliminary Injunction on December 11, 2017.  Mr. Manning attended.  During the hearing, Mr. Manning's GPS ankle monitor buzzed.  Peter Eliasberg, counsel for Mr. Manning, heard the buzzing and asked that the Court excuse Mr. Manning to call his parole agent.  Mr. Manning stepped outside of the courtroom and called his parole agent, Sean Wilson.  Mr. Wilson answered and asked Mr. Manning whether he had any "resources" outside of Los Angeles.  Mr. Manning, unsure of what this question meant, explained that he was in court and would call Mr. Wilson when the hearing ended.

69.     When Mr. Manning called his agent again after the hearing was over, Mr. Wilson told him that he was going to be transferred outside of Los Angeles.  Mr. Wilson further instructed Mr. Manning to return to parole the following morning to discuss the transfer with Mr. Wilson's supervisor, Mr. Ordaz.

70.     Fearful of what a transfer could mean for the church and pastoral relationships Mr. Manning had developed in Los Angeles, Mr. Manning went straight to the parole office after his conversation with Mr. Wilson.  Once there, he met with Mr. Ordaz and Mr. Bogris, another parole official, both of whom confirmed Mr. Manning would be transferred outside of Los Angeles.  Mr. Ordaz and Mr. Bogris told Mr. Manning that Richard Calvario, the victim of the crime for which Mr. Manning is on parole, had submitted a "1707" form asking that Mr. Manning be transferred out of the county.

71.     It was difficult for Mr. Manning to believe that Mr. Calvario just happened to submit the request on the very same day of his hearing.  Mr. Manning had been living in Los Angeles for more than 22 months since his release from prison and has had no contact with Mr. Calvario in more than 20 years.  He did not even know that Mr. Calvario resided in California.   Mr. Manning voiced these concerns and asked whether Mr. Calvario had reached out to parole, or whether parole had reached out to Mr. Calvario.  Neither Mr. Borgris nor Mr. Ordaz would give a straight answer, although Mr. Ordaz admitted the timing likely appeared "fishy."  Towards the end of the meeting, they stated that Karen Thacker would render a final decision on the transfer the following day.

72.     The threatened transfer was especially confusing to Mr. Manning because, for approximately one year before he was released from prison, he had petitioned parole to transfer him to Atlanta, Georgia, where he had grown up, and where his father, who has since passed away, was living.  Mr. Manning also worked with his first few parole agents, including Mr. Turner and Ms. Schindler, to effectuate this request.  During these conversations, Mr. Manning even asked whether Mr. Calvario lived in Los Angeles, and if so, whether he should be living here.  Parole responded that it didn't matter where Mr. Calvario was, and that they would not take that into consideration in deciding whether to grant the transfer.  Parole never granted the transfer requests or gave a clear explanation for the

1   denials.

2   73.   On Wednesday, December 13, 2017, the Court granted Mr.

3   Manning's Motion for Preliminary Injunction and enjoined Defendants from,

4   among other things, "taking any retaliatory or discriminatory measures or other

5   adverse actions with the purpose of precluding, deterring, or discouraging Manning

6   from exercising his rights under the Petition Clause of the First Amendment by

7   participating in the present action."

8   74.   On Friday, December 15, 2017, two days after the court entered the

9   Preliminary Injunction, Mr. Manning talked to Mr. Wilson on the phone.  Mr.

10  Wilson told him that he was going to be transferred to another parole jurisdiction.

11  Mr. Wilson followed up with a text message that stated, "You have been

12  transferred to the Indio/Palm Springs parole office.  You are hereby instructed to

13  report there on Monday December 18th at 10:00am.  The address is 79687

14  Bermuda Dunes, CA 92203.  The telephone number is 760-772-3157."  Had this

15  order gone into effect, Mr. Manning would have had less than one full business

16  day to pack up his life and move more than 100 miles away.

17  75.   Mr. Manning immediately called his attorney, Peter Eliasberg, who

18  said he would contact Defendants' counsel, Ms. Audra Call.  Mr. Eliasberg

19  telephoned Ms. Call and told her that Mr. Manning had informed him that Mr.

20  Wilson had directed Mr. Manning be transferred out of Los Angeles to a parole

21  office in the Coachella Valley, and that he had been directed to appear there on

22  Monday morning.  Mr. Eliasberg told Ms. Call that this transfer appeared to be

23  blatantly retaliatory based on its being issued just days after the Court had granted

24  Plaintiff's Motion for a Preliminary Injunction and because it was absurd to think

25  that someone who had been on parole and living in Los Angeles for 22 months

26  could be forced to transfer to a jurisdiction more than 100 miles away with fewer

27  than one full business day's notice, or that such a transfer could be effectuated

28  through nothing more than a phone call and text message.  Ms. Call told Mr.

1    Eliasberg she would look into it and get back to him.

2        76.    About an hour later, Ms. Call telephoned Mr. Eliasberg to inform him

3 that the transfer had been revoked and that Mr. Manning would not be required to

4 report to the parole office in the Coachella Valley on Monday.  Mr. Eliasberg

5 thanked her for acting so quickly but also told her that he thought it was outrageous

6 that Defendants had attempted to transfer Mr. Manning 48 hours after the entry of

7 the preliminary injunction and that they had done so with so little advance notice

8 and without providing Mr. Manning written notice of the basis for the transfer.

9        77.    Mr. Eliasberg subsequently called Mr. Manning and told him that the

10 order had been revoked and that Mr. Manning was not required to appear in Indio,

11 California on Monday.  Shortly after Mr. Eliasberg spoke with Mr. Manning, Mr.

12 Wilson called Mr. Manning on his cell phone and said that his supervisors had

13 contacted him and told him that Mr. Manning was to stay in Los Angeles.  Mr.

14 Manning asked why the transfer had been cancelled, and Mr. Wilson said he could

15 not explain.

16        78.    Now that Mr. Manning has lived in Los Angeles for 22 months, it

17 would be devastating to him to be transferred anywhere else.  He has developed

18 personal and professional relationships and feels deeply attached to the churches he

19 attends.  He has also set up his own church, which he describes as his life's work.

20 Moreover, he is transient and could not afford to travel outside of the city.

21 Although he does own a car that he sleeps in, it is in very poor condition and

22 breaks down often.  Even if he could afford gas money for his car, which he could

23 not, it is highly unlikely the car would make the trip without breaking down.

## CAUSES OF ACTION
## FIRST CAUSE OF ACTION
### Violation of the First Amendment, Freedom of Speech Clause; 42 U.S.C. § 1983

### (Against All Defendants)

28        79.    Plaintiff realleges and incorporate the foregoing paragraphs as if set

forth herein.

80.   Defendants' actions described herein violate the Freedom of Speech Clause of the First Amendment to the United States Constitution by prohibiting Plaintiff from accessing social media sites thereby barring his access to the richest sources of information, religious and political interaction, and widest audience available through any medium in the world.

81.   Plaintiff faces immediate threat of irreparable injury, i.e., injury for which there is no adequate damages remedy, by being barred from accessing social media to communicate and receive information.

## SECOND CAUSE OF ACTION
### Violation of the First Amendment, Free Exercise Clause; 42 U.S.C. § 1983
### (Against All Defendants)

82.   Plaintiff realleges and incorporates the foregoing paragraphs as if set forth herein.

83.   Defendants' actions described herein violate the Free Exercise Clause of the First Amendment to the United States Constitution by prohibiting Plaintiff from attending church or preaching.

84.   Plaintiff faces immediate threat of irreparable injury, i.e., injury for which there is no adequate damages remedy, by being barred from exercising his faith by attending church and preaching.

## THIRD CAUSE OF ACTION
### Violation of the First Amendment, Establishment Clause; 42 U.S.C. § 1983
### (Against All Defendants)

85.   Plaintiff realleges and incorporates the foregoing paragraphs as if set forth herein.

86.   Defendants' actions described herein violate the Establishment Clause of the First Amendment to the United States Constitution by prohibiting Plaintiff from attending church or preaching.

87.   Plaintiff faces immediate threat of irreparable injury, i.e., injury for

which there is no adequate damages remedy, by being barred from exercising his faith by attending church and preaching.

## FOURTH CAUSE OF ACTION
### Violation of the First Amendment, Petition Clause/Retaliation; 42 U.S.C. § 1983
### (Against Defendants Broome, Wilson, and Does 1-10)

88.     Plaintiff realleges and incorporate the foregoing paragraphs as if set forth herein.

89.     Defendants' actions described herein violate the Petition Clause of the First Amendment by retaliating against Plaintiff for working with legal counsel to petition government to eliminate two of his conditions of parole and dissuade him from continuing to work with legal counsel to redress his concerns with these conditions.

90.     Plaintiff faces immediate threat of irreparable injury, i.e., injury for which there is no adequate damages remedy, by being barred from exercising his faith by attending church and preaching.

## <u>PRAYER FOR RELIEF</u>

91.     Plaintiff therefore respectfully requests that the Court enter a judgment including:

a.     A declaratory judgment that Defendants' actions as described herein violate the Speech, Free Exercise, Establishment, and Petition Clauses of the First Amendment to the United States Constitution;

b.     A preliminary and permanent Injunction barring Defendants from enforcing Special Condition of Parole 084;

c.     A preliminary and permanent injunction barring Defendants from threatening to arrest Mr. Manning for, or otherwise barring him from, attending church or preaching in church;

d.     A Preliminary and Permanent Injunction Barring Defendants from Retaliating Against Mr. Manning for Exercising his First Amendment

1                   Rights;

2       e.     Reasonable attorneys' fees and costs; and

3       f.     Any other relief as may be just and proper.

4

5  Dated:   December 28, 2017     Respectfully Submitted,

6                               ACLU FOUNDATION OF SOUTHERN
   CALIFORNIA
7

8                               LAW OFFICE OF ERIN DARLING

9                               AMERICAN CIVIL LIBERTIES UNION
   SPEECH, PRIVACY, AND
10                              TECHNOLOGY PROJECT
11

12                              AMERICAN CIVIL LIBERTIES UNION
   PROGRAM ON FREEDOM OF
13                              RELIGION AND BELIEF

14

15

16                              By:   s/ *Peter Eliasberg*

17                                    PETER ELIASBERG

18                              Attorney for Plaintiff

19

20

21

22

23

24

25

26

27

28